# EXHIBIT A

*Assign? Will* — 14896245
2/74/15

(TO PLAINTIFF'S ATTORNEY: *Please Circle Type of Action Involved:* - TORT - MOTOR VEHICLE TORT - CONTRACT - EQUITABLE RELIEF - OTHER.)

# COMMONWEALTH OF MASSACHUSETTS

ESSEX, SS.

SUPERIOR COURT
CIVIL ACTION
No. 10-1793

Victor Okoye & Ogor W. Okoye , Plaintiff(s)

RECEIVED

AUG 2 5 2010

Litton Loan Servicing LP
Legal Department

v.

Bank of New York Mellon, Litton Loan Servicing et al , Defendant(s)

## SUMMONS

To the above named Defendant:

You are hereby summoned and required to serve upon Ogor WINNIE OKOYE, Esq. , plaintiff's attorney, whose address is 23 Central Avenue, Suite 405-07, Lynn, MA 01904, an answer to the complaint which is herewith served upon you, within 20 days after service of this summons upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint. You are also required to file your answer to the complaint in the office of the Clerk of this court at

_____ either before service upon plaintiff's attorney or within a reasonable time thereafter.

Unless otherwise provided by Rule 13 (a), your answer must state as a counterclaim any claim which you may have against the plaintiff which arises out of the transaction or occurrence that is the subject matter of the plaintiff's claim or you will thereafter be barred from making such claim in any other action.

WITNESS, BARBARA J. ROUSE , Esquire, at Salem, the
day of , in the year of our Lord two thousand

RECEIVED

AUG 2 5 2010

Litton Loan Servicing LP
Legal Department

Thomas H. Driscoll Jr.
*Clerk*

NOTICE TO DEFENDANT - You need not appear personally in court to answer the complaint, but if you claim to have a defense, either you or your attorney must serve a copy of your written answer within 20 days as specified herein *and* also file the original in the Clerk's Office

NOTES:
1. This summons is issued pursuant to Rule 4 of the Massachusetts Rules of Civil Procedure.
2. When more than one defendant is involved, the names of all defendants should appear in the caption. If a separate summons is used for each defendant, each should be addressed to the particular defendant.

Civil Action No. *10-1793*

VICTOR OKOYE AND OGOR OKOYE

VS.

BANK OF NEW YORK MELLON, ET AL

## NOTICE OF APPEARANCE

**TO THE CLERK OF THE ABOVE NAMED COURT:**

**Please enter my appearance as attorney for** plaintiff(s)

VICTOR OKOYE AND OGOR W. OKOYE

**in the above entitled action.**

**Date:** 8/19/10

Signature:

Print name: OGOR WINNIE OKOYE, Esq.

Address: BOS Legal, LLC.

Address: 23 Central Avenue, Ste. 405-07

City/State/Zip: Lynn, MA 01901

BBO#: 661,299

Phone Number: +1 (781) 596-0151

# CIVIL ACTION COVER SHEET

**TRIAL COURT OF MASSACHUSETTS**
**SUPERIOR COURT DEPARTMENT**
COUNTY OF ESSEX

DOCKET NO. *10-1793*

| PLAINTIFF(S) | DEFENDANT(S) |
|---|---|
| Victor Okoye & Ogor W. Okoye | Bank of New York Mellon et. al |

| Plaintiff Atty | Ogor Winnie Okoye | | Type Defendant's Attorney Name |
|---|---|---|---|
| Address | BOS Legal LLC; 23 Central Avenue, Suite 405-07 | Defendant Atty | Richard C. Demerle |
| | | Address | Michienzie & Sawin LLC; 745 Boylston Street |
| City | Lynn | State MA | Zip Code 01901 | City | Boston | State MA | Zip Code 02116 |
| Tel. | +1 (781) 596-0151 | BBO# 661,299 | |

## TYPE OF ACTION AND TRACK DESIGNATION (See reverse side)

| CODE NO. | TYPE OF ACTION (specify) | TRACK | IS THIS A JURY CASE? |
|---|---|---|---|
| C04 Foreclosure of Mortgage - X track | | | ( ) Yes  ( ) No |

The following is a full, itemized and detailed statement of the facts on which plaintiff relies to determine money damages. For this form, disregard double or treble damage claims; indicate single damages only.

## TORT CLAIMS
### (Attach additional sheets as necessary)

A. Documented medical expenses to date:
 1. Total hospital expenses — $
 2. Total doctor expenses — $
 3. Total chiropractic expenses — $
 4. Total physical therapy expenses — $
 5. Total other expenses (describe) *emotional distress, pain & suffering* — $ *100,000.00*

 Subtotal

B. Documented lost wages and compensation to date — $
C. Documented property damages to date — $
D. Reasonably anticipated future medical expenses — $
E. Reasonably anticipated lost wages and compensation to date — $
F. Other documented items of damages (describe) — $

G. Brief description of plaintiff's injury, including nature and extent of injury (describe)

*Plaintiff Victor Okoye has suffered emotional distress as a result of the actions of the defendants, including pain and suffering*

Total $ *100,000.00*

## CONTRACT CLAIMS
### (Attach additional sheets as necessary)

Provide a detailed description of claim(s): *Plaintiffs are entitled to recoup all interests and principal Plaintiffs have suffered actual damages including making payments made on said loan on principal and interest based on misleading and deceptive from Nov. 2007-present representations made by defendants; including punitive damages*

TOTAL $.*120,000.00*

PLEASE IDENTIFY, BY CASE NUMBER, NAME AND COUNTY, ANY RELATED ACTION PENDING IN THE SUPERIOR COURT DEPARTMENT

"I hereby certify that I have complied with the requirements of Rule 5 of the Supreme Judicial Court Uniform Rules on Dispute Resolution (SJC Rule 1:18) requiring that I provide my clients with information about court-connected dispute resolution services and discuss with them the advantages and disadvantages of the various methods."

Signature of Attorney of Record _____

Date: *8/19/2010*

A.O.S.C. 3-2007

SUPERIOR COURT
CIVIL ACTION NO:

ESSEX, SS

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

VICTOR OKOYE             \*
& OGOR W. OKOYE       \*
                             \*
   v.                       \*
                             \*
                             \*
THE BANK OF NEW YORK     \*
MELLON f/k/a as The Bank of   \*
New York as Trustee for the Holders   \*
of the GE-WMC             \*
Asset-Backed Pass-Through      \*
Certificates,                 \*
Series 2005-2;              \*
WMC Mortgage Corporation;     \*
MORTGAGE ELECTRONIC      \*
REGISTRATION SYSTEMS (MERS)   \*
AND LITTON LOAN SERVICING    \*
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

VERIFIED COMPLAINT FOR
EMERGENCY INJUNCTIVE/
DECLARATORY RELIEF, AND
SUIT FOR DAMAGES

## PARTIES AND JURISDICTION

A.

Plaintiffs sue Defendants for emergency injunctive and declaratory relief and damages arising out

of a mortgage loan transaction, including seeking permanent injunction to any purported

foreclosure on their primary residence. This Court has jurisdiction because the real property,

subject of this action is situated within the Essex County, Massachusetts.

1.      Plaintiffs are of majority age and are residents of Saugus, State of Massachusetts and

reside in their home located at 21 Orchard Avenue, Saugus, Massachusetts, 01906 (hereinafter

the "Property").

2. Defendant, Bank of New York as Trustee for the Holders of GE-WMC Asset-Backed Pass-Through Certificates, Series 2005-2 (hereinafter "BNY") is and was at all material times hereto, a foreign corporation organized and existing under the laws of Delaware, with its principal place of business in New York, NY, but is subject to the jurisdiction of this court pursuant to the Massachusetts long arm statute. M.G.L. c.223A § 3 as it transacts business in the Commonwealth of Massachusetts.

3. In this complaint, the Defendant BNY is a corporate entity functioning as an alleged trustee for holders of the GE-WMC Asset Backed-Pass Through Certificates, Series 2005-2 , which upon information and belief, may or may not be collateralized by the mortgage the subject of this action; and which may or may not have been properly registered; and which the certificate holders of the subject securities may or may not have an interest, in whole or in part , in the Mortgage and the Note, the subject of this action.

4. Defendant, WMC Mortgage Corporation ("WMC") is on information and belief, a foreign corporation with a principal place of business in Burbank, California which is subject to the jurisdiction of this Court pursuant to M.G.L. c. 223A § 3 by virtue of transacting business in the Commonwealth through lending real estate loans, including the subject of this complaint. They are to the best of Plaintiffs' knowledge, the original lenders, and holders of the mortgage in questions.

5. Defendant, Mortgage Electronic Registration System ("MERS"), is on information and belief a foreign corporation incorporated in the State of Delaware and having a principal place of business in Vienna, Virginia. It is subject to the jurisdiction of this Court pursuant to M.G.L. c. 223A § 3. At all times material hereto MERS is acting as a nominee for WMC Mortgage. On

2

information and belief, Defendant MERS has no legal or equitable interest in either the mortgage or the Note the subject of this action.

6.    Defendant, Litton Loan Servicing ("Litton") is on information and belief a foreign corporation that provides mortgage loan services, with its principal place of business in Houston, Texas. It is subject to the jurisdiction of this Court pursuant to M.G.L. c. 223A § 3. On information and belief, Defendant, Litton Loan, has no legal or equitable interest in either the mortgage or the Note the subject of this action. Litton is the servicer of the afore-mentioned mortgage, subject of this complaint.

7.    At all times material hereto, the named defendants were acting as Agents for each other.

B.                **BACKGROUND AND MATERIAL FACTS**

8.    Plaintiffs, Victor and Ogor Okoye, who are not and have never been engaged in the business of extending consumer loans, refinanced their mortgage with WMC on October 4, 2005 in connection with the Property subject of this action.

9.    Plaintiffs, Victor and Ogor Okoye, are husband and wife who own said Property jointly. The Property was encumbered by a Mortgage to WMC in the original amount of $409,700.00, which deed was executed by both Plaintiffs in favor of WMC by and through its nominee Mortgage Electronic Systems Inc (hereinafter MERS) on October 4, 2005.

10.    Only the first named Plaintiff, Victor Okoye, the only borrower on the loan, executed a promissory note (the "Note") in favor of WMC in the original principal amount.

11.    The Mortgage however, described both Plaintiffs, as the "Borrowers" and "Mortgagors" under the Security instrument. (See, Exhibit 1, Mortgage/Security Instrument; Pg. 1B).

12. The Mortgage identifies WMC as the Lender and also conferred a security interest on the Lender (WMC), by securing to Lender, the repayment of the loan, and all renewals, extensions and modifications of the loan and also the performance of Borrower's covenant and agreements under the Mortgage. It further specified that, "Borrower does hereby mortgage, grant and convey to MERS (*solely as a nominee* for the Lender and the Lender's successors and assigns) and to the successors and assigns of MERS . . .". *(Ex. 1, pg. 2. para. Q of Mortgage; emphasis is mine)*.

13. The Mortgage identified MERS as a separate corporation that is acting solely as a nominee for Lender and Lender's successor and assigns. *(pg. 1 para. C of Mortgage)*.

14. Another part of the Mortgage referred to MERS as the Mortgagee even though MERS is not the Lender, had no rights to the repayment of the underlying debt, and no role whatsoever in handling mortgage payments. *(pg. 1. para. C)*.

15. Another part of the document stated, "Borrower understands and agrees that MERS holds only *legal title* to the interest granted by Borrower in this Security Instrument, but if necessary to comply with law or custom, MERS *(as nominee for Lender and Lender assigns)* has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender, including but not limited to releasing and canceling this Security Instrument. *(pg. 3, para. 1)*

16. The word "nominee" and the relationship between WMC and MERS is defined nowhere on the Mortgage.

17. The Mortgage authorizes *only the Lender* to protect the Security if the Borrower fails to perform the covenant contained in the Security Instrument. *(Pg. 6. para. 9, **emphasis is mine**)*.

4

18.    The Mortgage expressly authorizes only the Lender to invoke the Statutory Power of Sale in the event of a default. (*Pg. 12, para. 22*).

19.    The Mortgage also stated that the Borrowers shall be discharged by the *Lender* upon the payment of all sums secured by the Security Instrument. (*Pg. 12, para. 23*).

20.    The Mortgage also directed the Borrower to make all payments to WMC, and the notice requirement in the Mortgage referred solely to the Lender, WMC.

21.    The Note and Mortgage identified WMC as the lender and set forth an initial monthly payment of $2,398.62. It was an Adjustable Rate Mortgage (ARM) with an initial interest rate of 6.5%, and it further provided that the interest rate may change on the first day of November 2007 and on that date every 6 months thereafter based upon the LIBOR index plus a fixed margin "LIBOR plus 5.5%". (See Ex. 2, pg.2 Adjustable Rate Rider).

22.    The Note further provided that the interest rate was subject to a cap of 9.5% and a floor of 6.5% at the first Change Date and that, after the first change date, it would never increase or decrease more than 1.000% from the rate payable for the previous six months; the interest rate subject to an overall cap of 13.000% and floor of 6.5%. *(supra)*.

23.    The Note and Mortgage provided that the Note holder would deliver or mail to Plaintiffs notice of any changes in interest rate or the amount of the new monthly payment before the effective date of change.

24.    Approximately five months after the closing of the loan, Plaintiff/Borrower, Victor Okoye, received correspondence from WMC, who admitted to an error on the loan documents to the extent that the terms of the loan as executed by the borrower was unfair to the borrower.

5

WMC unilaterally changed the terms of the promissory note, by adding the Borrower/Plaintiff will have a balloon payment after the 30 year maturity date since the Amortization date will be after the Maturity Date of the loan.

25. WMC unilaterally changed the terms of the promissory note on that account. Plaintiff was never made aware of this at the time of the loan and at closing and Plaintiffs never signed this purported new promissory note with the changes made unilaterally by WMC.

26. In mid, 2009, Plaintiffs started experiencing financial difficulty as a result of which they missed some payments.

27. Plaintiff, Victor Okoye, contacted Litton Loan, in May of 2009, in an attempt to forestall a potential default, a Litton representative advised him to continue making payments as he could be eligible for forbearance on the loan.

28. Litton on behalf of BNY as Trustee for the holders of the GE-WMC Asset-Backed Certificates, Series 2005-2 sent out a Notice of Default and Intent to Accelerate on June 21, 2009 quoting that the Plaintiffs were in arrears in the amount of $36, 685.98 which they must pay in order to cure the default. This figure was obviously inflated given that the Plaintiff missed only a couple of payments.

29. At the time of this Notice of Default and Intent to accelerate, BNY had no legal or equitable interest whatsoever in the Property in question as the records indicate that BNY was purportedly assigned the loan by MERS, acting as a Nominee of WMS on October 23, 2009.

30. At the time of closing of the loan, Plaintiffs were under the impression that Victor Okoye was borrowing from WMS who was the lender and were unaware of any relationship between himself and MERS.

6

31.    Defendant, BNY allegedly bought Plaintiffs' loan from MERS more than 120 days after the Plaintiff were allegedly in default of their mortgage.

32.    Plaintiff, Victor Okoye, upon receipt of the Intent to accelerate letter made several calls to Litton in an attempt to inquire as to how Litton came up with the inflated re-instatement quote but none of his calls were ever returned. Eventually, on or about September 1, 2009, he finally got a Litton representative over the phone and was advised to continue making his regular payment and to also apply for a loan modification.

33.    Plaintiffs continued making payment on their mortgage based on the advice of Litton until sometime in October 2009 when Plaintiff, Victor Okoye, spoke to Litton regarding his request for a loan modification. A Litton representative stated that they never received his prior request. He was again advised to re-submit some documents related to the loan modification which he promptly submitted.

34.    Litton acknowledged receipt of the loan modification packet and advised that the review process takes approximately 60 days for a request for loan modification. The letter also advised Plaintiffs to continue making payments on their mortgage. On November 12, 2009, he spoke to Stanley Williams at Litton who advised him that he owed an arrearage of $59,000.00. He requested a breakdown of the alleged arrearage and Litton's representative advised him to send out a letter of dispute.

35.    On November 13, 2010, Plaintiff, Victor Okoye application for a loan modification was denied. According to Litton, he did not meet the guidelines under the Home Affordable Modification Program ("HAMP"). Litton demanded payment of their alleged reinstatement quote

7

and advised Plaintiff, Victor Okoye to enter into a payment plan that entailed paying the alleged past due with the regular principal and interest. Litton never provided a breakdown of how this figure was calculated.

36. In a letter dated November 17, 2009, Litton advised Plaintiffs that he does not qualify for any other alternate work out plan including a loan modification.

37. Litton accepted his October 2009 payment but the November 2009 payment was returned by Litton in a letter dated November 23, 2009 even though they advised Plaintiffs to continue making their monthly payments. Plaintiff, Victor Okoye, contacted Litton to enquire on the status of the breakdown of the arrearage amount and also to discuss another alternate work out solution in order to prevent the impending foreclosure. Litton quoted yet another figure without sending the breakdown that Plaintiff had been requesting for the past couple of months.

38. In December of 2009, Plaintiff, Victor Okoye, sent out a formal letter of dispute to Litton regarding this purported inflated amount owed, but no one ever got back to him regarding how the figure was computed.

39. Every follow-up call made to Litton by Plaintiffs regarding the amount owed resulted in Plaintiff, Victor Okoye, being given a different quote. Each time, the figure was reduced from the last amount quoted whenever plaintiff asked questions regarding the computation. This showed that Plaintiff's account was never properly credited by Litton.

40. Unbeknownst to Plaintiffs, Litton had changed the amount of the monthly payment from $2,398.62 to $4,246.42 without any notification to Plaintiffs that the interest and or amount of monthly payment would change a clear violation of the express terms of the Mortgage and the Note. A Litton loan representative advised Plaintiff, Victor Okoye, that this new payment had

8

been in effect since December of 2008, a period of almost one year.

41.     In a letter dated October 9, 2009, Litton notified Plaintiffs that there would be an interest rate change and payment adjustments starting on December 1, 2009. The new payment was quoted as $4,246.41. In the letter, Litton acknowledged that it was the first change in interest rate and monthly payments since the inception of the loan.

42.     Monthly statements sent to Plaintiffs prior to this date confirmed that this new payment had been in effect long before the notice of the change date was given to the Plaintiff.

43.     On October 23, 2009 WMC through its "nominee" MERS purported to assign the mortgage to BNY, as Trustees for the Holders of the GE-WMC Asset-Backed Pass-Through Certificates, Series 2005-2, with Litton acting as agent for all parties. The purported assignment was recorded at the Essex County Registry of Deeds Book 29068, Page 491.

44.     On December 2, 2009 Plaintiff's attorney, (Ogor Winnie Okoye, Second plaintiff in this matter) via certified mail to Litton echoed the frustration of Plaintiff, Victor Okoye, whose numerous attempts to contact Litton had been unsuccessful. The letter further reiterated Litton's failure to negotiate in good faith with Victor Okoye, especially its failure to provide a breakdown of the reinstatement quote and/or modify the terms of the mortgage which Plaintiff, Victor Okoye, had been attempting to do in the preceding months.

45.     On January 8, 2010, Litton acknowledged receipt of Plaintiff's letter and also stated that they had enclosed the requested reinstatement quote in response to Plaintiff's request for the breakdown of the figure owed. **No reinstatement quote or breakdown of the quote was enclosed in the letter.**

46. Plaintiff's attorney, Ogor Winnie Okoye, sent yet another Certified mail to Litton on or about February 1, 2010 advising that neither the reinstatement quote nor the breakdown of the amount owed was enclosed in the letter that Litton sent to them. (It was received by Litton of February 4, 2010) Even though Litton received this letter, they still refused to provide either the alleged reinstatement quote or breakdown of the figure owed.

47. Meanwhile, on January 8, 2010, the Law firm of Michienzie & Sawin on behalf of BNY and Litton Loan Servicing filed a Service members' Complaint at the Land Court in Boston. BNY was claiming to be the holders of the Note and Mortgage to said Property by Assignment.

48. Plaintiffs objected to BNY's Service members' complaint on the ground that BNY lacked standing to institute a foreclosure complaint.

49. On February 16, 2010 Plaintiffs' through counsel sent to Defendant's Attorney and Litton, via certified mail, a qualified written request under the Real Estate Settlement Procedures Act (RESPA) seeking specific documents, including the loan documents as well as documents showing proof that BNY had standing to institute the foreclosure proceedings, in the form of being holders in due course of the Note and Mortgage.

50. Plaintiffs as at the date of filing this complaint never received any response from the Defendant, Litton.

51. Plaintiff continued requesting a loan modification from Litton. In mid February 2010 Litton via a telephone conversation indicated that they had since mailed to Plaintiff a Home Loan Modification Trial Period Plan (HAMP) packet which had the effect of modifying the mortgage and avoiding foreclosure.

52.  No such document was ever mailed to the Plaintiff. Plaintiffs continued calling Litton since they never received any HAMP packet from Litton. On or about February 25, 2010, Litton faxed over the HAMP packet to the Plaintiffs who never received the purported mailing from Litton. In order to accept the offer of the HAMP Trial program, Plaintiffs were required to return the signed offer packet with all the requested documents to Litton by March 1, 2010 which included Two (2) copies of the Trial Period Plan signed by all borrowers; the first month's trial period payment in the amount of $2,481.02; and a hardship affidavit to be completed and signed by all the borrowers.

53.  The trial period plan was effective from March 1, 2010 until May 1, 2010, and required that Plaintiff make regular monthly payments of $2,481.02. The HAMP trial offer also promised that if Plaintiffs were in compliance with the trial period plan, then Litton will provide the Plaintiffs with a HAMP "Modification Agreement" that would amend and supplement the Mortgage on the Property and the Note secured by the Mortgage.

54.  Plaintiffs submitted a timely response to the offer with all the documents requested including the first trial period payment. Litton confirmed full receipt of the requested documents. Plaintiffs fully complied with all terms and condition of the HAMP Trial period plan.

55.  By early June of 2010, while checking on the status of the pending HAMP modification request, a Litton representative, Jackie Bettie, during a phone conversation with Plaintiff requested yet another profit and loss statement and also demanded that the first named Plaintiff, Victor Okoye provide a statement describing his relationship with the second-named plaintiff, Ogor Winnie Okoye. She also indicated that these documents once provided will enable Litton reach a decision on the request for the HAMP modification.

11

56. During the same period around the second week in June, Litton by a letter dated May 27, 2010 indicated that the Plaintiffs had two outstanding documents that they needed to submit in order to process their HAMP modification; a signed copy of the most recent federal tax return with all schedules included and a copy of the most recent quarterly or year-to-date profit/loss statement.

57. Even though these were already previously provided to Litton and confirmed by their representative, on June 10, these documents were faxed over to Litton at the fax number provided by the Litton representative. Follow-up calls to Litton on June 2, 6, 14, and 21, 2010 confirmed that the documents had been received.

58. On or about June 21, 2010, in a denial letter dated June 14, 2010, Litton notified Plaintiffs that their HAMP request had been denied for a failure of the Plaintiffs to provide the requested documentations with the time-period requested (30-days). The letter also stated that the Plaintiffs even though unqualified for the HAMP modification may qualify for a non-HAMP loan modification with Litton.

59. Plaintiffs contacted Litton on the same day and spoke to a Litton representative, Talia Sanchez, who insisted that the letter was not a denial of the HAMP modification request but was rather, only a warning that the HAMP request will be denied should the requested documents not be provided to Litton within a 30-day period. Ms. Sanchez requested the Plaintiffs submit yet again, a new profit and loss statement without the personal expenses of the borrower.

60. On June 21, 2010 via Certified Mail (which was signed by a Litton representative, Francis Blackshear on June 23rd) Plaintiffs' attorney, Ogor Winnie Okoye recounted all these unfair and deceptive conducts perpetrated against Plaintiffs by Litton including Litton's unwillingness to act

12

in good faith throughout its dealings with the Plaintiffs especially pertaining to the denial of HAMP request on the basis of a lack of receipt of requested documents as well as the failure of Litton to respond to the several RESPA requests made by Plaintiffs through its attorneys.

61. In a response to the aforementioned letter from Plaintiffs, Litton by a letter dated July 7, 2010 (received by Plaintiffs on July 16, 2010) maintained that the denial of the HAMP modification was based on the non-provision of the documents requested from the Plaintiffs and listed certain specific demand for certain documents made on the Plaintiffs by Litton.

62. This letter also referenced a letter from Litton dated May 14 and 27 that made the purported requests for these specific documents.

63. This letter fraudulently manufactured documents that were never mailed to the Plaintiffs and purported that these documents were sent to the Plaintiffs in response to certain requests including RESPA requests made severally by Plaintiff on Litton. Specifically, this letter fraudulently manufactured a letter dated March 3, 2010 which was purported to have been sent to Plaintiffs. The letter purported to include enclosures, and listed several documents which were in fact never enclosed.

64. Neither Plaintiffs nor their attorney received any of these letters alleged to have been sent in response to requests made either by Plaintiffs' attorneys.

65. This letter from Litton even included responses to requests that were never made by Plaintiffs and seemed in parts to be a response made by Litton to a request made by another borrower.

66. Defendants have not provided any of the requested documents to the plaintiffs pursuant to the RESPA requests nor have they till date, provided a breakdown of the amount allegedly owed

13

in arrearage.

67. By a decision of the Land court dated August 16, 2010, Plaintiff's Motion to Dismiss the Servicemen complaint on the grounds of standing was dismissed.

68. Given the dismissal of Plaintiff's Motion to dismiss, Servicemen Complaint, Plaintiffs are in danger of having their Property unjustifiably foreclosed at any time by BNY as Litton has refused to negotiate in good faith.

C.

## COUNT ONE

## LACK OF STANDING – BNY

69. Plaintiffs re-allege and incorporate by reference its allegation in Paragraphs 1-68, above.

70. Defendant, BNY, instituted a non-judicial foreclosure proceeding to foreclose on a mortgage as to the Property which mortgage was originally issued in the name of WMC.

71. In order for BNY to maintain legal standing in connection with the subject loan transaction, they are required to show the entire chain of title of the Note and the entire chains of title of the mortgage.

72. Defendant, BNY has taken the unverified position, through its counsel, that they are "Assignees" of the Mortgage and the Note with regards to the Property by MERS who was never the Lender in the Security Instrument executed by the Plaintiff.

73. BNY has failed to prove or even take the position that it is the holder of all rights under the Note, which is the instrument of indebtedness which would then permit the legal holder thereof to declare a default which would trigger a foreclosure.

74. Furthermore, Defendant, BNY, as alleged "Trustee" for unnamed "Certificateholders" of a series of mortgage-backed securities, has failed to demonstrate that it, and not the

14

Certificateholders, is the party with the true ownership interest in the Mortgage the subject of this action, or that the Certificateholders have acceded or legally assigned their rights to and under the subject Mortgage to Defendant, BNY, specifically the right to seek a foreclosure.

75. As such, Defendant, BNY has not demonstrated that it has suffered an actual or threatened injury as a consequence of any default, which distinct and palpable injury is legally required under the applicable Massachusetts law in order for Defendant, BNY, to satisfy the legal prerequisite to prove that it has sufficient personal stake in and legal standing to institute the foreclosure on the Property.

76. Based upon the failure of the Defendants to respond to requests for breakdown of arrearage and/or the qualified written requests made under RESPA, Plaintiff has every reason to believe that the Defendants, BNY and Litton are neither the holder in due course of the note nor the owner of any rights under the mortgage.

D
## COUNT TWO

## UNFAIR AND DECEPTIVE ACTS OR PRACTICES UNDER CHAPTER 93A AND M.G.L.C.183 C – BNY, LITTON, WMC, MERS

77. Plaintiffs re-allege and reincorporate paragraphs 1 through 68 hereinabove as if set forth more fully herein below.

78. This is an action and claim for relief which is brought pursuant to G. L. c. 93A for damages and injunctive relief.

79. Plaintiffs are "person" within the meaning of G. L. c. 93(A)(1)(a).

80. The loan in question consummated between Plaintiffs and Defendants qualifies as a high-cost home loan" pursuant to G. L. c. 183C which defines it as a loan securing the borrower's

15

principal dwelling and that either exceeds by more than eight percentage points (for a first mortgage) the yield on Treasury securities with a comparable maturity period, or features total points and fees the greater of five percent of the total loan or $400.

81.     The Massachusetts Predatory Home Loan Practices Act, which became effective of November 7, 2004 prohibits Defendants from making a high cost home loan mortgage loan unless the Lender reasonably believes at the time that the loan is made that the borrower will be able to make the scheduled payment to repay the home loan based upon consideration of the borrower's current and expected income, current and expected obligations, employment status, and other financial resources other than the borrowers equity in the dwelling which secures repayment of the loan. G.L. c. 183C, § 4.

82.     Defendants Loan to Plaintiff, Victor Okoye, offered initial attractive monthly payments based on a forty year amortization schedule, with a balloon payment required at the end of thirty years; when usual amortization periods was a based on a thirty-year period.

83.     The actions of the Defendants, BNY, WMC, and Litton, and MERS with regards to the servicing, origination and institution of foreclosure proceedings against Plaintiffs constitute unfair and deceptive practices engaged in by a business within the course of trade or commerce within the meaning of G.L. c.93(A)(1)(b).

84.     The presuit notice provision are not applicable as to the Defendants, BNY, WMC, Litton, and MERS as they do not maintain a place of business or keep assets within the Commonwealth of Massachusetts.

85.     Further, Plaintiffs have every reason to believe Litton has not been forwarding their payments to the holder in due course of the note or to any other authorized party.

86.     Plaintiffs have every reason to believe that Litton willfully and fraudulently inflated the amount of arrearage owed by Plaintiffs in order to effect a foreclosure of Plaintiffs' Property.

87.     Plaintiffs willfully, and in bad faith refused to negotiate alternative work out option to Plaintiff including denying the HAMP modification requests on pretextual grounds and refusing to produce documents required pursuant to a qualified RESPA request in order to affect a sham foreclosure of said Property.

88.     Accordingly Plaintiff is in jeopardy, to wit: the true holder in due course and potentially dozens or even thousands of third parties could come forward claiming an unsatisfied interest in the promissory note and may or may not be subject to Plaintiffs' various affirmative defenses and counterclaims.

89.     Defendants engaged in a pattern and practice of defrauding Plaintiff in that, during the entire life of the mortgage loan, Defendants failed to properly credit payments made; incorrectly calculated interest on the accounts; and have failed to accurately debit fees.

90.     At all times material, Defendants had actual knowledge that the Plaintiff' accounts were not accurate but that Plaintiff would make further payments based on Defendants' inaccurate accounts.

91.     Defendant, Litton has engaged in a pattern of fraud and deceit throughout the country preying on Borrowers like the Plaintiff and in this case, has fraudulently manufactured new documents which were previously not produced to Plaintiffs, purporting that they were in fact previously provided to Plaintiffs in order to fraudulently cure their non-compliance with specific requests made by Plaintiffs.

92.     The Mortgage as well as the loan application and documents contained material omission

17

and misleading representations which Defendants knew were in direct conflict with the original Uniform Residential Loan Application, early TIL, and Plaintiffs' stated intentions at the time of original application for the loan was made.

93. The end result of the false and misleading representations and material omissions contained fraudulently caused Plaintiff, Victor Okoye, to execute a predatory loan documents.

94. As a direct and proximate result of the actions of the Defendants set forth above, Plaintiffs overpaid in interest.

95. Defendants seek to acquire title wrongfully through a pattern of intentional fraudulent conduct; the fraudulent manufacture of defaults; and the intentional demand for monies to which it was not legally entitled and documents that have been provided severally for the sole purposes of securing foreclosure on Plaintiffs' Property.

96. Pursuant to G.L. c. 93(A)(9)(1), Plaintiffs are entitled to seek remedies of damages and injunctive relief.

97. As a direct and proximate result of the unfair and deceptive practices of Defendants Plaintiffs have suffered and continue to suffer damages, including emotional, mental and physical anguish.

E                          **COUNT THREE**

**COMPLAINT TO QUIET TITLE TO REAL PROPERTY
AGAINST BNY AND LITTON**

98. Plaintiffs reaffirm and re-allege paragraphs 1-68 above as set forth more fully hereinbelow.

99. Plaintiffs has mad several oral requests as well as written requests for a breakdown of the arrearage owed as well as an authorized Qualified Written Requests to the Defendants, Litton as

18

well as the attorney for the other Defendants, which Defendants have failed and/or refused to answer despite acknowledging receipt thereof and despite repeated demands from Plaintiffs.

100.    The real party in interest on the lender side may be the owners of the asset backed security, the insurer through some claim of equitable interest. The security may or may not be a "securitized" bond deriving its value from the underlying mortgages of which the subject mortgage may or may not be one. Thus Plaintiff is entitled to quiet title against Defendants, clearing title of the purported subject mortgage encumbrance.

101.    Plaintiffs are informed and believe and thereon allege that, at all times herein mentioned each of the defendants sued herein was the agent and employee of each other and were at all times acting within the purpose and scope of such agency and employment.

102.    Plaintiffs are informed and believe and thereupon allege that and each of the Defendants claim or might claim an interest in the property adverse to plaintiff herein. However, the claim of said Defendants is without any right whatsoever, and said Defendants have no legal or equitable right, claim, or interest in said property.

103.    Plaintiff therefore seeks a declaration that the title to the subject property is vested in plaintiffs alone and that the defendants herein, and each of them, be declared to have no estate, right, title or interest in the subject property and that said defendants and each of them, be forever enjoined from asserting any estate, right, title or interest in the subject property adverse to plaintiff herein.

WHEREFORE, Plaintiffs pray this Court will enter judgment against defendants and each of them, as follows:

19

a) To enter an order granting temporary and permanent injunctive relief expressly precluding and canceling any attempt by any of the named Defendants either jointly or severally to foreclosure said Property as Defendants have no legal standing or the proper legal or equitable interest in either the Note or Mortgage to institute or maintain a foreclosure reasons set forth herein in Count One;

b) For an award of money damages as provided by Chapter 93A, as well as damages for court costs and attorneys' fees including entry of double and treble damages for the reasons set forth in Count Two;

c) For a declaration and determination that Plaintiffs are the rightful holder of title to the Property and that the attempt by the Defendant, BNY to conduct a foreclosure sale of said Property is legally defective and

f) For such other and further relief as the court may deem proper.

## DEMAND FOR JURY TRIAL

Plaintiffs, Victor Okoye, and Ogor Winnie Okoye hereby demand trial by jury on all matters so triable as a matter of right.

Respectfully Submitted
Victor & Ogor Okoye,

_____
Ogor Winnie Okoye (BBO 661299)
BOS Legal, LLC
23 Central Avenue, Ste. 405-407
Lynn, MA 01901
Tel:781-596-0151
Fax:781-596-3900

Dated: August 19, 2010

20

## VERIFICATION

We, Victor and Ogor Okoye being the named plaintiffs in the above-captioned matter, knowing the contents thereof, have found the allegations and facts set forth therein are based on our own personal knowledge and are true, except as to those allegations based on information and belief which we believe to be true.

Signed under the pains and penalties of perjury on this 19th day of August 19, 2010.

_____
Victor Okoye & Ogor W Okoye

## CERTIFICATE OF SERVICE

I hereby certify that the above document, Complaint for Emergency Injunctive and Declaratory Relief and suit for damaged with attached exhibits 1 & 2 is being served within the time required by the Superior Court Standing Order No. 1-88 or by leave of the Regional Administrative Justice. I further certify that I served a true copy of this document upon the attorney of record for the Defendant by mail on August 19, 2010.

_____
Ogor Winnie Okoye, Esq.

EXHIBIT 1

After Recording Return To:
WMC MORTGAGE CORP. - POST
CLOSING

1 RAMLAND RD

ORANGEBURG, NY 10962

Attn: (Equity Services)

Prepared By:
KENNETH MANZANO

WMC MORTGAGE CORP.

6320 CANOGA AVENUE 10TH FL
(MAILROOM)

WOODLAND HILLS, CA 91367

_____

[Space Above This Line For Recording Data]

## MORTGAGE

OKOYE
Loan #: ▮▮▮▮▮▮
MIN: ▮▮▮▮▮▮
PIN: ROBERT S. MOLLOY

Serv #: ▮▮▮▮▮▮

### DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A) "Security Instrument" means this document, which is dated October 4, 2005 , together with all Riders to this document.

(B) "Borrower" is VICTOR OKOYE AND OGOR W OKOYE

Borrower is the mortgagor under this Security Instrument.

(C) "MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. MERS is the mortgagee under this Security Instrument. MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.

(D) "Lender" is WMC MORTGAGE CORP.

Lender is a Corporation organized and existing under the laws of CALIFORNIA . Lender's address is P.O. BOX 54089, LOS ANGELES, CA 90054-0089

(E) "Note" means the promissory note signed by Borrower and dated October 4, 2005 . The Note states that Borrower owes Lender Four Hundred Nine Thousand Seven Hundred And 00/100 Dollars (U.S. $ 409,700.00 ) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than November 1, 2035 .

(F) "Property" means the property that is described below under the heading "Transfer of Rights in the Property."

MASSACHUSSETTS--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT Form 3022 1/01 (page 1 of 14 pages)
DOCUKMA1
DOCUKMA1.VTX 08/27/2035

ì*WMC*Â0011345367KMA00101420051004120923{Î

(G) **"Loan"** means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

(H) **"Riders"** means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

- [x] Adjustable Rate Rider
- [ ] Condominium Rider
- [ ] Second Home Rider
- [ ] Balloon Rider
- [ ] Planned Unit Development Rider
- [ ] Biweekly Payment Rider
- [ ] 1-4 Family Rider
- [x] Other(s) [specify] **Balloon Rider**

(I) **"Applicable Law"** means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

(J) **"Community Association Dues, Fees, and Assessments"** means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

(K) **"Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

(L) **"Escrow Items"** means those items that are described in Section 3.

(M) **"Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

(N) **"Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on, the Loan.

(O) **"Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

(P) **"RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. §2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(Q) **"Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby mortgage, grant and convey to MERS (solely as nominee for Lender and Lender's successors and assigns) and to the successors and assigns of MERS, with power of sale, the following described property located in the

COUNTY                          of   ESSEX
[Type of Recording Jurisdiction]          [Name of Recording Jurisdiction]
LEGAL DESCRIPTION ATTACHED HERETO AND MADE A PART HEREOF AND KNOWN AS EXHIBIT 'A'.

I*WMC*Â0011345367KMA00201420051004120924QÎ

which currently has the address of **21 ORCHARD AVENUE**
[Street]

**SAUGUS** , Massachusetts **01906** ("Property Address"):
[City]                              [Zip Code]

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:
   1. **Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

   Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

   2. **Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

MASSACHUSSETTS--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT          Form 3022 1/01          (page 3 of 14 pages)
DOCUKMAJ
DOCUKMA3.VTX  08/27/2005

I*WMC*Â0011345367KMA00301420051004120925Î

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3. **Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by

ΐ*WMC*Â0011345367KMA00401420051004120925=Î

RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

**4. Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing,

I*WMC*Â0011345367KMA00501420051004120926zÎ

any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. **Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7. **Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8. **Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

9. **Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security

Î*WMC*Â0011345367KMA00601420051004120926)Î



Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. Borrower shall not surrender the leasehold estate and interests herein conveyed or terminate or cancel the ground lease. Borrower shall not, without the express written consent of Lender, alter or amend the ground lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

10. **Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

l*WMC*Â0011345367KMA00701420051004120927fl

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) **Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.**

(b) **Any such agreements will not affect the rights Borrower has – if any – with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.**

**11. Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

I*WMC*Â0011345367KMA00801420051004120927|Î

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent

MASSACHUSSETTS--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT          Form 3022 1/01          (page 9 of 14 pages)
DOCUKMA9
DOCUKMA9.VTX   08/27/2005

I\*WMC\*Â0011345367KMA00901420051004120928RÎ

by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

    **16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

    As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

    **17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

    **18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

    If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

    If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

    **19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or

DOCUKMA10
DOCUKMA.VZX   08/27/2005    I*WMC*Â0011345367KMA010014200510041209928oÎ

(d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

20. Sale of Note; Change of Loan Servicer; Notice of Grievance. The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21. Hazardous Substances. As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

I\*WMC\*Â0011345367KMA0110142005100412092 9EÎ



NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the STATUTORY POWER OF SALE and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the STATUTORY POWER OF SALE, Lender shall mail a copy of a notice of sale to Borrower, and to other persons prescribed by Applicable Law, in the manner provided by Applicable Law. Lender shall publish the notice of sale, and the Property shall be sold in the manner prescribed by Applicable Law. Lender or its designee may purchase the Property at any sale. The proceeds of the sale shall be applied in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

23. Release. Upon payment of all sums secured by this Security Instrument, Lender shall discharge this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

24. Waivers. Borrower waives all rights of homestead exemption in the Property and relinquishes all rights of curtesy and dower in the Property.

MASSACHUSSETTS--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT          Form 3022 1/01          (page 12 of 14 pages)
DOCUKMA12
DOCUKMA2G.VTX  08/27/2005

I*WMC*Â0011345367KMA01201420051004120930WÎ

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

- Borrower - VICTOR OKOYE - Date -

OGOR W OKOYE - Date -

Ì*WMC*Â0011345367KMA01301420051004120930mÎ

[Space Below This Line For Acknowledgment]

STATE OF _MASSACHOSETTS_ §
COUNTY OF _MIDDLESEX_ §

On this _4TH_ day of _OCTOBER, 2005_, before me, the undersigned notary public personally appeared

_VICTOR OKOYE AND OGOR W. OKOYE_

proved to me through satisfactory evidence of identification, which were _DRIVERS LICENSES_, to be the person(s) whose name(s) _all_ signed on the preceding or attached document, and acknowledged to me that _they_ signed it voluntarily and for its stated purpose.

Notary Public

My Commission Expires: _October 18, 2007_



MASSACHUSSETTS--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT    Form 3022 1/01    (page 14 of 14 pages)
DOCUKMA14
DOCUKMA2.VTX  08/27/2005

Ì*WMC*Â0011345367KMA01401420051004120931CÎ

EXHIBIT 2

# ADJUSTABLE RATE RIDER
### (6-Month LIBOR Index - Rate Caps)
### (First Business Day of Preceding Month Lookback)

Serv #: ▮▮▮▮▮

OKOYE
Loan #: ▮▮▮▮▮
MIN: ▮▮▮▮▮

THIS ADJUSTABLE RATE RIDER is made this 4th    day of  October, 2005    ,
and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Security
Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure the
Borrower's Adjustable Rate Note (the "Note") to WMC MORTGAGE CORP.

(the "Lender") of the same date and covering the property described in the Security Instrument and located at:
21 ORCHARD AVENUE, SAUGUS, MA 01906

[Property Address]

THE NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN THE
INTEREST RATE AND THE MONTHLY PAYMENT. THE NOTE LIMITS THE
AMOUNT THE BORROWER'S INTEREST RATE CAN CHANGE AT ANY ONE
TIME AND THE MAXIMUM RATE THE BORROWER MUST PAY.

ADDITIONAL COVENANTS.  In addition to the covenants and agreements made in the Security
Instrument, Borrower and Lender further covenant and agree as follows:

A.    INTEREST RATE AND MONTHLY PAYMENT CHANGES
The Note provides for an initial interest rate of    6.500    %. The Note provides for
changes in the interest rate and the monthly payments, as follows:

4.    INTEREST RATE AND MONTHLY PAYMENT CHANGES
(A)    Change Dates
The interest rate I will pay may change on the first day of November, 2007    ,
and may change on that day every  6th    month thereafter. Each date on which my interest rate
could change is called a "Change Date."

Ì*WMC*Â0011345367DQ600100320051004120931WÎ

**(B)   The Index**

Beginning with the first Change Date, my interest rate will be based on an Index. The "Index" is the six month London Interbank Offered Rate ("LIBOR") which is the average of interbank offered rates for six-month U.S. dollar-denominated deposits in the London market, as published in *The Wall Street Journal*. The most recent Index figure available as of the first business day of the month immediately preceding the month in which the Change Date occurs is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index which is based upon comparable information. The Note Holder will give me notice of this choice.

**(C)   Calculation of Changes**

Before each Change Date, the Note Holder will calculate my new interest rate by adding **Five and One-Half** percentage point(s) ( **5.500** %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the maturity date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

**(D)   Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than **9.500** % or less than **6.500** %. Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than **One** percentage point(s) ( **1.000** %) from the rate of interest I have been paying for the preceding **6** months. My interest rate will never be greater than **13.000** %, or less than **6.500** %.

**(E)   Effective Date of Changes**

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F)   Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**B.   TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER**

Section 18 of the Security Instrument is amended to read as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which

I*WMC*Â0011345367DQ600200320051004120932-Î

Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Adjustable Rate Rider.

10/04/05

- Borrower - VICTOR OKOYE - Date -

10/4/05

OGOR W OKOYE - Date -

DOCUDO63
DOCUDQ63.VTX 08/25/2005

Î*WMC*Â0011345367DQ6003003200510041209 32CÎ